**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

IOTA XI CHAPTER OF SIGMA CHI
FRATERNITY, George Mason
University; RYAN DUCKWITZ,
Consul, Iota Xi Chapter of Sigma
Chi Fraternity; JUSTIN PIETRO, Pro
Consul, Iota Xi Chapter of Sigma
Chi Fraternity,
    *Plaintiffs-Appellants,*

    v.

PAMELA PATTERSON, Associate
Dean of Students, individually and
in her official capacity; MICHELE
GOUBADIA, Associate Director for
Student Activities, Greek Life,
individually and in her official
capacity; GIRARD MULHERIN, Dean
of Students, individually and in
his official capacity; SANDY
HUBLER, Vice President of
University Life, individually and
in her official capacity; ALAN G.
MERTEN, President, individually
and in his official capacity,
    *Defendants-Appellees,*

    and

GEORGE MASON UNIVERSITY,
    *Defendant.*

No. 08-1417

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:07-cv-00883-LMB-TCB)

Argued: January 27, 2009

Decided: May 13, 2009

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Motz and Judge Duncan joined.

## COUNSEL

**ARGUED:** Christopher Aldo Porco, THE LAW OFFICES OF CHRISTOPHER ALDO PORCO, P.L.L.C., Washington, D.C., for Appellants. Stephen R. McCullough, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** William C. Tucker, BUTLER, WILLIAMS & SKILLING, P.C., Richmond, Virginia, for Appellants. Robert F. McDonnell, Attorney General of Virginia, William E. Thro, Special Counsel, William C. Mims, Chief Deputy Attorney General, David G. Drummey, Brian E. Walther, K. Anne Gambrill Gentry, Assistant Attorneys General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

## OPINION

KING, Circuit Judge:

The Iota Xi Chapter of Sigma Chi Fraternity (the "Chapter") and two of its officers, Ryan Duckwitz and Justin Pietro, sued George Mason University (the "University") and several of its administrators[1] in the Eastern District of Virginia, alleging, inter alia, constitutional claims under 42 U.S.C. § 1983. The Chapter and certain of its members were sanctioned by the University following their involvement in a series of disciplinary incidents, and the plaintiffs allege that those sanctions deprived the Chapter and its members of their procedural due process and free speech rights. The district court awarded summary judgment to the defendants, *see Iota Xi Chapter of the Sigma Chi Fraternity v. Patterson*, 538 F. Supp. 2d 915 (E.D. Va. 2008), and this appeal followed. As explained below, we affirm.

### I.

### A.

### 1.

The University is a public institution located in Fairfax County, Virginia, where, until May 8, 2006, the Chapter was an officially recognized student group.[2] Between February

---

[1]The University administrators named as defendants are Pamela Patterson, Associate Dean of Students; Michele Goubadia, Associate Director for Student Activities, Greek Life; Girard Mulherin, Dean of Students; Sandy Hubler, Vice President of University Life; and Alan G. Merten, University President. The plaintiffs sued these defendants in their individual and official capacities.

[2]According to the district court, "[o]fficial recognition allows a student group to publish their affiliation with the University, apply for certain university funds, and seek assistance from the University in planning events." *Iota Xi Chapter of the Sigma Chi Fraternity v. Patterson*, 538 F. Supp. 2d 915, 919 n.2 (E.D. Va. 2008).

2005 and August 2006, the Chapter and its members were involved in a string of on- and off-campus incidents that culminated in the revocation of the Chapter's official University recognition and the individual discipline of several Chapter members.

Five separate disciplinary incidents led to the Chapter being sanctioned. The first such incident occurred on February 26, 2005, when the Chapter co-hosted a party at an off-campus house. A female University student asserted that she was sexually assaulted at the party by a Chapter member. The victim initiated administrative charges against the Chapter member, and the University's Sexual Assault Hearing Panel subsequently adjudicated the member as responsible. As a result, the Chapter member was expelled from the University.

The second such incident occurred in mid-August 2005, when several Chapter members took part in a party where underage guests drank excessively. As a result of this second incident, defendant Girard Mulherin, Dean of Students, placed the Chapter on interim suspension on August 24, 2005. Mulherin lifted the interim suspension on September 6, 2005, after determining that the Chapter had not authorized the party, and that the Chapter had fully cooperated with the University's investigation.

The third incident took place on September 7, 2005, when the Chapter hosted another party where underage guests consumed alcohol, and where a second female University student claimed that she had been sexually assaulted by a Chapter member. The victim filed an administrative complaint in connection with that event, and the offending Chapter member was adjudicated to be responsible for the sexual assault. He was placed on disciplinary probation for the remainder of his undergraduate career.

Finally, two incidents of alleged hazing occurred on December 7, 2005. The first hazing incident occurred at about

8:30 a.m., when several Chapter members and pledges gathered on-campus near Fenwick Library and began to sing and march (the "library incident"). Defendant Michele Goubadia, Associate Director for Student Activities, Greek Life, witnessed the event from her office and concluded that the Chapter was conducting hazing activity. The second hazing incident occurred later that day, when Goubadia learned that a Chapter pledge had informed his instructor that he could not go home to retrieve an extra-credit assignment (the "classroom incident"). The instructor inferred that the student could not go home because of hazing by the Chapter, and she informed Goubadia about the classroom incident. In response to these suspected hazing incidents, Goubadia placed the Chapter on interim suspension, prohibiting it from participating in all social events, community service, and recruitment efforts. On December 8, 2005, Goubadia sent a memorandum to defendant Pamela Patterson, Associate Dean of Students, characterizing the two December 7 events as hazing. That same day, Patterson sent an interim suspension notice to the Chapter, restricting it from conducting any social event where more than three Chapter members or pledges were present, pending a University investigation.

The University subsequently determined that a disciplinary hearing was warranted on the five incidents described above. On February 7, 2006, the University informed the Chapter that a disciplinary hearing would be conducted on May 4, 2006. After the Chapter requested a detailed description of the charges against it, the University, on February 23, 2006, provided the Chapter with a "Complaint" listing the following charges:

1. Hazing — 8:30 a.m. on December 7, 2005 in the area of Fenwick Library on the George Mason Campus.

2. Providing alcohol to minors — September 7, 2005.

> 3.  Underage consumption of alcohol — September 7, 2005.
>
> 4.  Sponsoring a party under conditions that resulted in sexual assault/s on a female guest. February 26, 2005 and September 7, 2005[.]

J.A. 774.[3] On March 10, 2006, Dean Mulherin offered to settle the charges with the Chapter with a two-year suspension of the Chapter's University recognition, which the Chapter declined. The University provided the Chapter, in advance of the disciplinary hearing, with a list of the witnesses that the University intended to call.

### 2.

On May 4, 2006, the University convened a panel of three students from the University's Student Judicial Board (the "Panel") to address the four charges against the Chapter. During a five-hour hearing (the "Hearing"), the Chapter was permitted to make opening and closing statements, object to certain testimony, cross-examine witnesses, and present evidence.

At the Hearing, Dean Mulherin represented the University and presented several witnesses in support of the charges against the Chapter. Associate Director Goubadia testified concerning the library incident, which she characterized as hazing. Juliet Blank-Godlove, the instructor involved in the classroom incident, also testified. With regard to the classroom incident, Blank-Godlove stated that she "was concerned for hazing. It seemed to me that [the Chapter pledge] was part of a kidnap process, part of a pre-initiation process where he's not able to go home." J.A. 620. Additionally, the two female victims of the sexual assaults at Chapter-sponsored parties

---

[3]Citations herein to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

testified that they had consumed alcohol at those parties despite being underage, and that they were sexually assaulted by Chapter members. When the Chapter's representative sought to cross-examine these witnesses about whether they had actually been sexually assaulted, Mulherin stated that the prior sexual assault ruling should not be reopened, because to do so could "revictimize the victim by going through the details of this event again." *Id.* at 637. The Panel's hearing officer agreed and precluded further inquiry on that subject. A male friend of one of the sexual assault victims, who was with the victim on the night she was assaulted, also testified. He stated that he had seen the victim consuming alcoholic beverages at the party, and that when he looked for her later in the evening in the backyard of the house, Chapter members told him to go back inside the house. He said that he later learned the victim had been sexually assaulted in a shed in the backyard.

The Chapter also presented witnesses at the Hearing. Two of its witnesses testified as to the Chapter's overall character. One female witness, who was dating a Chapter member, described the fraternity as welcoming and trustworthy, and explained that she had not seen any aggressive behavior against women by Chapter members. Another witness testified that the Chapter had raised funds to assist him with medical bills. The Chapter also presented testimony seeking to rebut the University's allegation that it had engaged in hazing. Several witnesses — who had been Chapter pledges at the time of the library incident — testified that the incident had just been a "fun thing," not a hazing ritual. J.A. 694. Furthermore, the student who was involved in the classroom hazing incident testified that Blank-Godlove had misinterpreted his statements. He explained that the reason he could not retrieve his assignment was because he did not have his car that week and not because of hazing. He further explained that the assignment had been for extra credit, and that he felt it was unnecessary to retrieve it.

At the conclusion of the Hearing, Dean Mulherin recommended that the Chapter be permanently dismissed from campus. Mulherin later explained that his recommendation was based on the Chapter's refusal to acknowledge that it had engaged in any wrongful conduct. Characterizing the Chapter's communications leading up to the Hearing as "hostile in tone," he concluded that "they had not come to a realization that they were engaged in conduct that was not acceptable." J.A. 869-D. In Mulherin's view, the Chapter refused "to recognize that they had a problem." *Id.* at 869-C. Similarly, Associate Dean Patterson stated that "nobody from the fraternity . . . showed any concern about the charges, only what the university was doing." *Id.* at 924-D to 925-A.

By letter dated May, 8, 2006, the University notified the Chapter that the Panel had concluded, by clear and convincing evidence, that the Chapter had engaged in "(1) [h]azing on December 7, 2005"; (2) "[p]roviding alcohol to underage persons on September 7, 2005"; and (3) "[s]ponsoring social events under conditions that resulted in sexual assaults on female guests" on February 26 and September 7, 2005. J.A. 151. The Panel found the proof on the charge of underage consumption of alcohol to be insufficient, and dismissed that charge.

As a result of the Panel's decision, the University imposed the following sanctions. First, it revoked the Chapter's University recognition until at least September 1, 2016.[4] Second, the Dean of Students and the Director of Student Activities were instructed "to monitor membership in George Mason University recognized fraternal organizations to insure that

---

[4]The revocation of University recognition precludes the Chapter from applying for University funding and publicizing itself as an officially recognized organization. Furthermore, the Chapter may not participate in "organizational affairs which would imply university recognition." J.A. 872-C. Loss of recognition also precludes the Chapter from booking space on campus or using campus facilities.

the current membership of Sigma Chi fraternity does not re-emerge under a different name." J.A. 151. Finally, the decision was "to be published as deemed appropriate by the Dean of Students in order to inform and educate the George Mason University community regarding our institutional values." *Id.* On November 2, 2007, the University publicized the results of the Hearing in *The Mason Gazette*, a university newspaper.

The Chapter appealed the Panel's decision to defendant Sandy Hubler, Vice President for Student Life, who rejected the appeal on June 2, 2006. Hubler explained that, in reaching her decision, she had "carefully considered both the appeal document and supporting exhibits" submitted by the Chapter, and concluded that the Chapter had "failed to provide new evidence, identify a defect in the proceedings, or specify a standard of fairness that was abridged." J.A. 152. She also determined that "the sanctions imposed are proportionate to the offense." *Id.*

3.

Several weeks after the Hearing, in August 2006, two additional incidents led to the discipline of several Chapter members, including plaintiffs Pietro and Duckwitz. Pertinent to these proceedings, Pietro and another Chapter member attended a Greek Organizational Recruitment Fair (the "orientation fair") wearing Sigma Chi t-shirts. A University official saw the two Chapter members at the orientation fair and notified Associate Director Goubadia. Goubadia confronted the members and told them that the event was for recognized organizations only, and that they could not be included because the Chapter was not a recognized student group. The second incident involved an off-campus golf tournament and "Brotherhood Day" by Chapter members, including Duckwitz, aspects of which contravened the University's sanctions against the Chapter.

These two incidents were ultimately referred to H. David Shaw, the University's Director of Judicial Affairs. Pietro,

Duckwitz, and four other Chapter members were then charged with "[f]ailure to comply with a university official," "[u]nauthorized use of the George Mason University" name or logo, and "[f]ailure to comply with an official judicial sanction." J.A. 1157. Shaw conducted a disciplinary hearing on these charges and found that all six Chapter members were responsible. As a result of that hearing, Pietro was given a "formal warning," placed on "probationary status" for one year, required to write a ten-page research paper on student ethics, and "restricted from participating in any university sponsored extracurricular activities for the 2006-07 Academic Year." *Id.* at 1165. Duckwitz was similarly given a formal warning, placed on probationary status, and restricted from participating in extracurricular activities for the 2006-07 Academic Year. *Id.* at 1164.

### B.

On August 31, 2007, the Chapter, Pietro, and Duckwitz filed their complaint against the University and the administrator defendants in the Eastern District of Virginia. The complaint asserted claims under 42 U.S.C. § 1983, alleging, inter alia, that the University and the administrator defendants had violated the plaintiffs' Fourteenth Amendment rights to procedural due process (the "procedural due process claim"), as well as their right to freedom of speech under the First Amendment (the "free speech claims").[5]

On September 14, 2007, the district court denied the plaintiffs' motion for a preliminary injunction, by which they had sought to prevent the University from imposing its sanctions. Then, on November 9, 2007, the court dismissed the University as a defendant, concluding that the University, as an arm of the Commonwealth of Virginia, could not be sued under

---

[5]The Complaint also alleged equal protection, conspiracy, and supervisory liability claims under § 1983, as well as a state law breach of contract claim. None of these claims, however, are at issue in this appeal.

§ 1983 without its consent. In February 2008, the parties filed cross-motions for summary judgment. Pertinent to this appeal, the defendants' memorandum in support of their motion for summary judgment exceeded by two pages the page limit prescribed by the court's local rules. Rejecting the plaintiffs' request that the memorandum be stricken in its entirety, the court instead ordered that its final two pages be stricken. On March 10, 2008, the court entered summary judgment in favor of the defendants, and denied the plaintiffs' cross-motion for summary judgment. *See Iota Xi Chapter of the Sigma Chi Fraternity v. Patterson*, 538 F. Supp. 2d 915 (E.D. Va. 2008).

On April 9, 2008, the plaintiffs timely filed their notice of appeal in this matter. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's award of summary judgment. *See Tigrett v. Rectors & Visitors of the Univ. of Va.*, 290 F.3d 620, 626 (4th Cir. 2002). In assessing a summary judgment ruling, we view the evidence in the light most favorable to the non-moving party, drawing all reasonable factual inferences in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). We are entitled to sustain a district court's judgment on "any ground apparent from the record." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 (4th Cir. 2009). Finally, we review for abuse of discretion a district court's imposition of sanctions for a violation of the court's local rules. *See Dove v. Codesco*, 569 F.2d 807, 810 (4th Cir. 1978).

## III.

In their appeal, the plaintiffs maintain that the district court erred in three respects in awarding summary judgment to the defendants. First, the plaintiffs contend that the court erred by rejecting their procedural due process claim. Second, the

plaintiffs assert that the court erroneously rejected their free speech claims. Finally, the plaintiffs maintain that the court erred in failing to strike the memorandum submitted in support of the defendants' motion for summary judgment. We address these contentions in turn.

## A.

The plaintiffs first contend that the district court "should have provided appropriate relief to the Chapter for having successfully proved that its due process rights were violated." Br. of Appellants 22. In order for the plaintiffs to succeed on their procedural due process claim, they are obliged to show (1) a cognizable "liberty" or "property" interest; (2) the deprivation of that interest by "some form of state action"; and (3) that the procedures employed were constitutionally inadequate. *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988).

In assessing a procedural due process claim, "[u]nless there has been a 'deprivation' [of a protected liberty or property interest] by 'state action,' the question of what process is required . . . is irrelevant, for the constitutional right to 'due process' is simply not implicated." *Stone*, 855 F.2d at 172. The plaintiffs assert that the defendants, in sanctioning the Chapter, deprived it and its members of two constitutionally protected rights. First, the plaintiffs contend that the University deprived the Chapter of its constitutional liberty interest in its members' right to free association by instituting sanctions against the Chapter. Second, the plaintiffs maintain that the University deprived the Chapter of its property interest in its "good name, honor, reputation, and integrity" when the University published the results of the Hearing in a University newspaper.

## 1.

We first assess the issue of whether the University deprived the Chapter and its members of a liberty interest in the right

to free association. The First Amendment protects two types of association: intimate association and expressive association. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). As the Supreme Court has explained, intimate association consists of the choice to "enter into and maintain [an] intimate human relationship[ ]." *Id.* at 617. The Court has defined expressive association as the "right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618. In these proceedings, the plaintiffs rely solely on the contention, accepted by the district court, that the Chapter members engaged in expressive association.

In its summary judgment award to the defendants, the district court concluded that the Chapter possessed a protected liberty interest in the expressive associational right of its members. *See Iota Xi Chapter of the Sigma Chi Fraternity v. Patterson*, 538 F. Supp. 2d 915, 923 (E.D. Va. 2008). The court explained that "[t]he Chapter has adequately described its institutional mission to inculcate its members with certain leadership skills and community values and, as a result, it is protected by the First Amendment's expressive associational right." *Id.* The court then determined that the defendants had deprived the Chapter members of their right to free association, concluding that prohibiting Chapter members from joining any recognized fraternal organization at the University "constitute[d] a deprivation of the Chapter members' right to expressive association." *Id.* at 924. Ultimately, however, the court rejected the plaintiffs' procedural due process claim because the University's procedures were constitutionally adequate and its sanctions were reasonable. *See id.* at 927.

Although we agree with the district court's ultimate disposition of this claim, we do not, after reviewing the record, adopt its reasoning on the deprivation issue. In concluding that the defendants had deprived the Chapter members of their free association right, the court found that the members were

prohibited from joining any other fraternities on the University campus, erroneously relying on a document entitled "SUGGESTED SANCTIONS" that was apparently attached to a "Hearing Report Form" from the University Judicial Board. *See Iota Xi*, 538 F. Supp. 2d at 924. As the court observed, among the suggested sanctions is "'[a] prohibition preventing current members of Sigma Chi from belonging to any fraternal organization recognized by the University.'" *Id.* (quoting J.A. 778). Notably, those suggested sanctions are not the sanctions that the University ultimately imposed. Indeed, by letter dated May 8, 2006, from Associate Dean Patterson to the Chapter's representative, "[t]he following sanctions were recommended to and accepted by the Judicial Administrator":

> University recognition of Sigma Chi Fraternity is to be immediately revoked and not reinstated prior to September 1, 2016. At that time, the fraternity may apply for university recognition.

> The Dean of Students and the Director of Student Activities are asked to monitor membership in George Mason University recognized fraternal organizations to insure that the current membership of Sigma Chi fraternity does not re-emerge under another name . . . .

> These decisions are to be published as deemed appropriate by the Dean of Students.

J.A. 779.

The sanction relied on by the district court in its ruling — that Chapter members are prohibited from joining any fraternity — is plainly not among the sanctions imposed by the University. Nor does the record reflect that any Chapter members have been prevented from joining other fraternities. Rather, the University revoked its recognition of the Chapter

and then simply sought to ensure that it did not evade the revocation sanction by reconstituting itself under a different name. The court thus misapprehended the record in relying on the proposition that Chapter members are "prohibited from joining any recognized fraternal organization on the George Mason campus." *Iota Xi*, 538 F. Supp. 2d at 924. Moreover, the plaintiffs have not proffered any other compelling theory on the deprivation question. In this circumstance, we are content to conclude — without deciding whether the Chapter possessed a cognizable liberty interest or whether the University procedures were constitutionally adequate — that the University did not deprive the Chapter members of any free association right.

2.

Because of its disposition of the liberty interest issue, the district court declined to reach and address the question of whether the Chapter possessed a property interest in its reputation. *See Iota Xi*, 538 F. Supp. 2d at 923 n.10. Having disagreed with the court's reasoning, however, we are obliged to dispose of that issue.

In this case, the plaintiffs maintain that the University's publication in *The Mason Gazette* that the Chapter had "facilitated sexual assaults," J.A. 1173, had the effect of labeling the Chapter as "a sexual predator," marking the Chapter with a "badge of disgrace." Br. of Appellants 24. In support of this contention, the plaintiffs rely on language from the Supreme Court's decision in *Wisconsin v. Constantineau* that, "[w]here a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." 400 U.S. 433, 437 (1971).

Five years after that decision, however, the Court emphasized that *Constantineau* should not be read as broadly as the plaintiffs now suggest. In *Paul v. Davis*, the Court made clear

that there is no constitutional right to be free from stigma. *See* 424 U.S. 693, 706-10 (1976). Referring to its *Constantineau* decision, the Court emphasized that it had "never held that mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." *Id.* at 706; *see also Siegart v. Gilley*, 500 U.S. 226, 233 (1991) (recognizing that "injury to reputation by itself is not a 'liberty' interest protected under the Fourteenth Amendment"); *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) ("Publication of stigmatizing charges alone, without damage to 'tangible interests such as employment,' does not invoke the due process clause." (quoting *Paul*, 424 U.S. at 701)).

Put simply, in this case the plaintiffs have identified no injury to the Chapter — economic or otherwise — resulting from the University's published statements in *The Mason Gazette*. As such, the plaintiffs have failed to identify a cognizable, constitutionally protected property interest in the Chapter's reputation. We are thus obliged to affirm on this issue.

## B.

The plaintiffs next contend that the district court erred in awarding summary judgment to the defendants on the free speech claims. The plaintiffs identify three separate alleged infringements of the First Amendment. First, the plaintiffs assert that the defendants punished Chapter members for singing and dancing in front of the library (the "library claim"). Second, the plaintiffs maintain that the defendants retaliated against the Chapter for rejecting the University's pre-Hearing settlement offer (the "retaliation claim"). And, third, the plaintiffs contend that two Chapter members were punished for displaying Chapter letters on their clothing at the orientation fair (the "orientation claim"). The court awarded summary judgment to the defendants on each of these claims, determining that the Chapter lacked standing to pursue the library

claim, and that the retaliation claim and the orientation claim both lacked merit.

First, with regard to the library claim, the district court agreed with the plaintiffs that the students' singing and dancing in front of the library was protected speech, but it concluded that the plaintiffs lacked standing to pursue the claim. *See Iota Xi*, 538 F. Supp. 2d at 928. For a plaintiff to possess standing to pursue a lawsuit, there must be "injury, causation, and redressability." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 329 (4th Cir. 2008). "Redressability" requires a plaintiff to allege that "the asserted injury was the consequence of the defendants' actions, or *that the prospective relief will remove the harm*." *Warth v. Seldin*, 422 U.S. 490, 505 (1975) (emphasis added). It must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).

In these proceedings, as the district court explained, even if the plaintiffs succeeded on the library claim, they would not be entitled to relief because "the University's sanctions are fully supported by an adequate and independent justification — the determination that the Chapter irresponsibly hosted two off-campus parties." *Iota Xi*, 538 F. Supp. 2d at 928. Thus, even if the members' free speech rights were infringed when they were punished for signing and marching in front of the library, other adequate grounds existed for the University's sanctions, such as the two incidents of sexual assault. As the court explained,

> there was extensive, reliable evidence that underage George Mason students, including the two female victims, were served alcohol at two separate Chapter-sponsored parties and that some students experienced severe intoxication. Furthermore, . . . the [Panel] took notice of the earlier disciplinary findings that two sexual assaults occurred in the

> vicinity of these parties. This record established an evidentiary basis upon which the [Panel] could reasonably conclude that the events and the atmosphere of the Chapter-sponsored parties were contributing factors to the sexual assaults.

*Id.* at 927. The court emphasized that "it was entirely reasonable for the University to classify these events as antithetical to its educational mission and the safety of its students." *Id.* Thus, absent the hazing charge, the University's sanctions on the Chapter are yet reasonable, and the library claim is not redressable because a ruling on that claim would not alter that conclusion. Because the library claim is not redressable, the plaintiffs lack standing to pursue it, and we must affirm the court's ruling.

Second, the district court concluded that the retaliation claim lacked merit because "the University is entitled to impose any sanction permitted by its own rules and regulations." *Iota Xi*, 538 F. Supp. 2d at 928. The University, the court explained, was entitled to offer a lesser punishment to the Chapter, and then impose a harsher penalty after its more lenient offer was rejected and the Hearing concluded. The court correctly observed that such an offer is analogous to a prosecutor's offer to a criminal defendant. "In the criminal context," the court explained, "a prosecutor is free to indict a defendant on more serious charges if the defendant insists on his right to a jury trial." *Id.* at 928 n.20. Here, the University offered the Chapter a more lenient punishment if it would settle, and the Chapter refused that offer. The plaintiffs have failed to identify how their rights have been contravened, and summary judgment was therefore also appropriate on the retaliation claim.

Third, regarding the orientation claim, the district court ruled that there was no genuine issue of material fact because the proper party was not named as a defendant. *See Iota Xi*, 538 F. Supp. 2d at 929. H. David Shaw, the University's

Director of Judicial Affairs, was the University official who conducted the hearing concerning these incidents, and who also administratively adjudicated the ensuing charges. Thus, Shaw was the official who inflicted the alleged constitutional injury on the plaintiffs. In order to obtain relief on that claim, the plaintiffs should have named Shaw as a defendant, and their failure to do so entitles the existing defendants to judgment as a matter of law on the orientation claim. *Cf. Moore v. Pemberton*, 110 F.3d 22, 23 (7th Cir. 1997) ("[T]he right defendants in a § 1983 suit are the persons whose wrongful acts harmed the plaintiff.").

## C.

Finally, we briefly examine the plaintiffs' contention that the district court erred in refusing to strike the memorandum that the defendants submitted in support of their summary judgment motion. The defendants' memorandum consisted of thirty-two pages, exceeding the thirty-page limit specified in the court's local rules. In response, the court struck the last two pages of the memorandum.[6]

Pursuant to Local Rule 7(F)(3) of the Eastern District of Virginia, "[a]ll briefs, including footnotes . . . shall not exceed thirty (30) . . . pages double-spaced." The plaintiffs' rely on the rule's use of the word "shall," asserting that it means that the district court lacked the discretion to impose any sanction other than striking the defendants' entire memorandum. Thus, they contend, striking the entire submission was the only permissible and appropriate remedy.

---

[6]In striking the last two pages of the defendants' memorandum, the district court apparently also struck the page containing the signature of counsel. The plaintiffs contend that the defendants' summary judgment submission therefore lacked a signature, and, under Federal Rule of Civil Procedure 11, the entire memorandum should have been stricken. Put simply, we deem this contention to be meritless. The memorandum was properly signed by counsel when it was submitted to the district court, and thus complied with Rule 11.

In these proceedings, the district court acted well within its discretion in fashioning a sanction for the defendants' failure to comply with Rule 7(F)(3). "It has long been recognized," we have explained, "that federal courts possess certain implied inherent powers that 'are necessary to the exercise of all others.'" *United States v. Moussaoui*, 483 F.3d 220, 236 (4th Cir. 2007) (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)). Although Rule 7(F)(3) utilizes mandatory language, it does not specify any particular sanction for a party's noncompliance, and the court was entitled to rely on its inherent authority to fashion an appropriate sanction.[7] The court exercised that discretion by striking the last two pages of the defendants' memorandum, and the plaintiffs have failed to show how the court abused its discretion in that respect. *See Crowley v. L.L. Bean, Inc.*, 361 F.3d 22, 28 (1st Cir. 2004) ("Within wide limits, it is for courts, not litigants, to decide what rules are desirable and how rigorously to enforce them." (internal quotation marks omitted)). As a result, this final contention must also be rejected.

## IV.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*

---

[7]To support their contention, the plaintiffs rely on the district court decision in *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787 (E.D. Va. 2007), which struck a party's entire brief for failure to comply with the page limit restrictions specified in the local rules. In *Custer Battles*, the court struck the plaintiffs' response briefs because, rather than submit a single thirty-page brief, they had submitted two briefs that totaled forty-five pages. *See Custer Battles*, 472 F. Supp. 2d at 792-93. Although the court struck both briefs, its decision was an exercise of its discretion, rather than an application of a strict mandate spelled out in the local rules.