Filed:  August 1, 2013

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-1538
(2:10-cv-00029-D)

TRUSTEE ROC F. SANSOTTA, Trustee and Executor for Estate of
Father Joseph Klaus; ROC F. SANSOTTA, Individually; RALPH S.
TOMITA;  GLORIA  H.  TOMITA;  CAROLE  A.  SHACKELFORD;  JAMES
BREGMAN; LINDA ATSUS; GEORGE D. RUSIN,

             Plaintiffs – Appellants,

        v.

TOWN OF NAGS HEAD,

             Defendant – Appellee,

        and

TIMOTHY WILSON, Individually,

             Defendant.

O R D E R

        The  Court  amends  its  opinion  filed  July  25,  2013,  as

follows:

        On  page  15,  first  full  paragraph,  line  1  --  the  word

"as" is corrected to read "was."

                            For the Court – By Direction

                            /s/ Patricia S. Connor
                                    Clerk

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-1538**

TRUSTEE ROC F. SANSOTTA, Trustee and Executor for Estate of
Father Joseph Klaus; ROC F. SANSOTTA, Individually; RALPH S.
TOMITA; GLORIA H. TOMITA; CAROLE A. SHACKELFORD; JAMES
BREGMAN; LINDA ATSUS; GEORGE D. RUSIN,

Plaintiffs – Appellants,

v.

TOWN OF NAGS HEAD,

Defendant – Appellee,

and

TIMOTHY WILSON, Individually,

Defendant.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Elizabeth City.   James C. Dever
III, Chief District Judge.  (2:10-cv-00029-D)

Argued: May 17, 2013                   Decided: July 25, 2013

Before SHEDD, DAVIS, and DIAZ, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published
opinion.   Judge Shedd wrote the opinion, in which Judge Davis
and Judge Diaz joined.

**ARGUED:** J. David Breemer, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Appellants. Benjamin Marshall Gallop, HORNTHAL, RILEY, ELLIS & MALAND, LLP, Nags Head, North Carolina; John D. Leidy, HORNTHAL, RILEY, ELLIS & MALAND, LLP, Elizabeth City, North Carolina, for Appellee. **ON BRIEF:** William J. Brian, Jr., Keith P. Anthony, Research Triangle Park, North Carolina, for Appellants.

---

SHEDD, Circuit Judge:

The owners of six beachfront cottages sued the Town of Nags Head, North Carolina, in state court after the Town declared their cottages to be in violation of its nuisance ordinance. After the Town removed the case to federal court, the district court granted summary judgment to the Town on the owners' procedural due process and equal protection claims and dismissed the owners' takings claim as unripe. The cottage owners now appeal the district court's decision. For the following reasons, we affirm the district court's grant of summary judgment, reverse the district court's decision to dismiss the takings claim, and remand the case for further proceedings.[1]

I.

A.

Nags Head ("the Town") is located along the North Carolina Outer Banks on the Atlantic Ocean. Roc Sansotta, Ralph and Gloria Tomita, Carole Shackelford, James Bergman, Linda Atsus, George Rusin, and the estate of Joseph Klaus own six cottages on Seagull Drive in the Town. Roc Sansotta manages these cottages.[2]

---

[1] Although this case arises out of the same general facts as Toloczko v. Town of Nags Head, -- F.3d -- (4th Cir. 2013), this case involves different plaintiffs and different legal claims.

[2] For simplicity, we refer to the Plaintiff-Appellants collectively as "the Owners."

3

Like many parts of North Carolina's Outer Banks, the Town's beaches have eroded in recent decades, some of them at a rate of approximately two feet per year for over two decades. The beaches near Seagull Drive have eroded much faster, at a rate of approximately eight feet per year during these decades. As the beaches have eroded, cottages that were once landward of the first line of stable, natural vegetation are now seaward of this line and on the beach itself, between the vegetation line and the Atlantic Ocean. Since 2001, the six cottages involved in this case have been seaward of the vegetation line. Being located directly on the beach creates greater potential for damage to the cottages during severe storms, so Sansotta has taken measures to protect the cottages, including extending the pilings supporting the cottages 25 feet into the ground and putting extra sand around the cottages before storms.

On November 12, 2009, a major storm hit the Town, damaging multiple beachfront cottages. During the storm, the ocean breached Seagull Drive and washed out part of the road. Town officials then set up a barricade and ordered Sansotta and the contractors that he had hired to help protect the cottages to stop working on the cottages and leave the beach. Sansotta and his contractors ultimately complied with this order. Despite Sansotta's efforts to protect the six cottages that he managed,

4

the storm washed away much of the sand from around the cottages, resulting in their septic tanks being exposed and other damage.

The Town's Nuisance Ordinance provides three bases for declaring a building to be a nuisance as a result of storm or erosion damage. It states:

> The existence of any of the following conditions associated with storm-damaged or erosion-damaged structures or their resultant debris shall constitute a public nuisance.
>
> (a) Damaged structure in danger of collapsing;
>
> (b) Damaged structure or debris from damaged structures where it can reasonably be determined that there is a likelihood of personal or property injury;
>
> (c) Any structure, regardless of condition, or any debris from damaged structure which is located in whole or in part in a public trust area or public land.[3]

---

[3] The public trust doctrine is the principle, rooted in Roman civil law and English common law, that the public has the right to access and use navigable waters and the state will protect that right. In the United States, this doctrine is a matter of state law. PPL Montana, LLC v. Montana, 132 S. Ct. 1215, 1234–35 (2012).

The Town and the Owners strongly disagree about the scope of the public trust in North Carolina. They agree that "wet beach"—that is, the beach seaward of the mean high water mark—may not be privately owned but that "dry beach"—that is, the beach between the mean high water mark and the first line of stable vegetation—may be privately owned. See Appellant's Br. at 6; Appellee's Br. at 20. They disagree, however, on whether both of these parts of the beach are part of the public trust. (Continued)

5

Nags Head, N.C., Code § 16-31(6) (emphasis added).

On November 30, 2009, Town Manager Cliff Ogburn notified the Owners by letter that the Town was declaring the cottages to be nuisances under subsections (b) and (c) of § 16-31(6). The letter informed the Owners that if the nuisance was not abated within 18 days, the Town would impose civil fines of $100 per day per cottage. Based on the Town's reliance on subsection (c), the only way that the Owners could abate the nuisance was to remove the cottages. Because demolishing the cottages was the only way to abate the nuisance, the nuisance declaration informed the Owners that no development permits would be issued for the cottages.[4] The cottages remained standing in late January 2010, at which time the Town began imposing the fines.

---

The Town views the public trust as encompassing the entire beach, both the "wet beach" and the "dry beach." See Appellee's Br. at 21. The Owners, on the other hand, contend that only the "wet beach" is part of the public trust. See Appellant's Br. at 8-9. Ultimately, despite the vigor with which the parties dispute this issue, we need not address it because that issue is irrelevant to the legal analysis required here.

[4] Eventually, the Town changed its no-permit policy, and it granted permits to other cottage owners. Sansotta claims he was never told of this change in policy, and based on his belief that the Town would not issue permits, he never applied to the Town for a permit for any of the cottages he managed.

Relatedly, in July 2010, the Town amended its ordinances to prohibit the issuance of permits for any structure that had been declared a nuisance under § 16-31(6)(c). The July 2010 (Continued)

6

In addition to these six cottages, the Town had also declared 20 other cottages nuisances, four before the November 12 storm and 16 after. Although the owners of some cottages demolished their cottages based on the declaration, other owners have fought the declaration, resulting in litigation in both state and federal court. See, e.g., Toloczko, -- F.3d --; Town of Nags Head v. Cherry, Inc., 723 S.E.2d 156 (N.C. Ct. App. 2012).

B.

In May 2010, approximately four months after the Town began imposing these fines, the Owners filed suit against the Town in state court. The Town timely removed the case to the federal district court in the Eastern District of North Carolina. After various motions in the district court, the Owners' second amended complaint asserted 14 claims against the Town, stating claims under both federal and state law.[5] The Town asserted four

---

ordinance was the subject of separate litigation between the Owners and the Town, but it is not relevant to the legal analysis here. See Sansotta v. Town of Nags Head ("Sansotta II"), 2:11-CV-3-D, 2012 WL 2919895 (E.D.N.C. July 17, 2012).

[5] The Owners brought five federal claims: (1) a declaratory judgment that the Town's actions deprived the Owners of their substantive due process rights; (2) a declaratory judgment that the Town's actions deprived the Owners of their procedural due process rights; (3) a declaratory judgment that the Town's actions deprived the Owners of equal protection under the law; (4) a § 1983 claim based on the constitutional violations; and (Continued)

7

counterclaims, three of which sought an order of abatement, each on a different legal basis, and one of which sought recovery of the civil penalties that the Town had imposed.

While this litigation was ongoing, in early 2011 the Town obtained permission from the U.S. Army Corps of Engineers to undertake a massive $36 million beach renourishment project. By August 2011, the part of the renourishment project near the six cottages was completed, resulting in 200 feet of new beach in front of the cottages. Based on the new beach, the Town withdrew the nuisance declaration based on § 16-31(6)(c) in September 2011; the Town claimed that the cottages were still in the public trust but that they "no longer impermissibly or unacceptably restrict or obstruct the use of and access to the

_____

(5) a regulatory takings claim under the Fifth Amendment. They also brought nine state-law claims: (1) a declaratory judgment that cottages are not in public trust area; (2) a declaratory judgment that § 16-31(6)(c) exceeds the Town's authority; (3) a declaratory judgment that the Town's actions violated N.C. Gen. Stat. §§ 160A-441 et seq.; (4) a declaratory judgment that the Town lacks the authority to declare structures on the "dry beach" to be nuisances; (5) a declaratory judgment that § 16-31(6)(c) does not authorize the Town to declare structures on the "dry beach" to be nuisances; (6) a declaratory judgment that the Town's restricting access to the cottages was unlawful; (7) an inverse condemnation claim; (8) a negligence claim based on the Town's restricting access to the cottages on the day of the storm and the Town's failing to inspect the cottages before issuing the nuisance declaration; and (9) a claim for preliminary and permanent injunctions against the Town's efforts to demolish the cottages, assess civil penalties, or prevent the Owners from protecting the cottages.

8

ocean beach." J.A. 784. The Town also invited the Owners to apply for permits to repair the cottages. The nuisance declaration based on § 16-31(6)(b), however, remained in effect.

## C.

Both parties moved for partial summary judgment. The district court granted summary judgment to the Town on the Owners' procedural due process claim because the Town never deprived the Owners of a property right, or alternatively, because the Owners had a postdeprivation remedy through an inverse condemnation proceeding. The court granted summary judgment to the Town on the equal protection claim because the Town's decision to declare only some cottages on the beach to be nuisances was rationally related to ensuring easy access for emergency vehicles along the beach.[6] In addition to granting summary judgment on these claims, the district court dismissed the takings claim as unripe. Having disposed of the Owners' federal claims, the district court remanded the Owners' state-law claims, as well as the Town's four counterclaims, to state court. See Sansotta v. Town of Nags Head ("Sansotta I"), 863 F. Supp. 2d 495 (E.D.N.C. 2012). The Owners timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

---

[6] The district court also granted summary judgment to the Town on the Owners' substantive due process claim, a decision the Owners have not appealed.

9

II.

We first address the Owners' claims under the Due Process Clause and Equal Protection Clause.

A.

We review a grant of summary judgment de novo and apply the same legal standards as the district court. Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 433 (4th Cir. 2013). Under Federal Rule of Civil Procedure 56, summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based on the "materials in the record." Fed. R. Civ. P. 56. In conducting our review, we must view all evidence in the light most favorable to the nonmoving party. Hardwick ex rel. Hardwick, 711 F.3d at 433. At this stage, "we do not 'weigh the evidence,' but rather we only determine 'whether there is a genuine issue for trial.'" Id. (quoting Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

B.

The Owners contend that the Town violated their procedural due process right by taking their money and property rights in the cottages without providing any predeprivation process. We disagree.

10

The Due Process Clause of the Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Procedural due process simply ensures a fair process before the government may deprive a person of life, liberty, or property, Wolf v. Fauquier Cnty. Bd. of Supervisors, 555 F.3d 311, 323 (4th Cir. 2009), but "does not require certain results," Tri Cnty. Paving, Inc. v. Ashe Cnty., 281 F.3d 430, 436 (4th Cir. 2002).

To succeed on a procedural due process claim, a plaintiff must satisfy three elements. First, he must demonstrate that he had a constitutionally cognizable life, liberty, or property interest. Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 145 (4th Cir. 2009). Second, he must show that the deprivation of that interest was caused by "some form of state action." Id. (quoting Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988)). That deprivation can be by physical appropriation, Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982), or by a regulation that deprives an owner of all economically valuable uses of the land, Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019 (1992). Third, he must prove "that the procedures employed were constitutionally inadequate." Patterson, 566 F.3d at 145.

11

Here, the Owners' claim fails because they cannot show that the Town deprived them of any constitutionally cognizable property right. They assert two property interests: (1) the money that would be used to pay the fines imposed by the Town; and (2) the right to use and enjoy the cottages as part of their fee simple ownership. Although each of these interests is a constitutionally protected property right and thus meets the first element of the claim, the Owners fail to satisfy the second element because the Town never deprived them of these interests.

First, although money is clearly a cognizable property interest, see, e.g., Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 571–72 (1972) (including money in the list of quintessential property rights protected by the Constitution), the Town never deprived the Owners of any money because the Owners never actually paid the fine. The Town's imposition of fines is not the equivalent of actually taking the Owners' money. Cf. Sniadach v. Family Fin. Corp. of Bay View, 395 U.S. 337, 340–42 (1969) (holding that garnishment of wages is a deprivation).[7] The Owners thus have suffered no deprivation, so

---

[7] Because the Owners refuse to pay the fine, the Town is unable to collect the fine—and thereby deprive the Owners of their money—until the Town has prevailed in a civil action. See N.C. Gen. Stat. § 160A-175(c); see also Nags Head, N.C., Code § 1-6(c)(6) (authorizing the Town to impose fines of no more than (Continued)

12

their interest in their money cannot be the basis of a successful procedural due process claim.

Second, the right to use and enjoy the cottages as part fee simple ownership is also a cognizable property interest. See, e.g., United States v. James Daniel Good Real Prop., 510 U.S. 43, 53–54 (1993) (observing that a person's "right to maintain control over his home, and to be free from governmental interference, is a private interest of historic and continuing importance"). The Owners appear to assert two theories of how this property interest was taken. First, they argue that the nuisance declaration clouded their title, thereby limiting their ability to dispose of the property.[8] Second, they contend that the Town's actions deprived them of the ability to use and enjoy the cottages, which they claim is an inherent part of fee simple

---

$500 per day for violations of Chapter 16, Article II of the Town Code); id. § 1-6(f) (authorizing the Town to seek a court order to enforce the Town's ordinances).

[8] Although we resolve this issue by focusing on the Town's authority to enforce its nuisances ordinances, we note that the nuisance declaration did not cloud the Owners' title. Compare Connecticut v. Doehr, 501 U.S. 1, 12 (1991) (observing that "attachments, liens, and similar encumbrances . . . are sufficient [deprivations] to merit due process protection") with Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 15 (1984) (holding that a lis pendens does not result in a deprivation).

13

ownership.[9]  Although the Town limited their ability to use and enjoy the cottages, that limitation was not a deprivation of any property right.

The Town's actions here were all legitimate government actions intended simply to enforce its nuisance ordinances. Such regulatory actions do not constitute a deprivation of property because they represent limitations on the use of property that "inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership."  Lucas, 505 U.S. at 1029.  Abating public nuisances and protecting the public trust have long been part of governmental authority in North Carolina.  See, e.g., Ward v. Willis, 51 N.C. 183, 185 (1858) (discussing the public trust doctrine); Dunn v. Stone, 4 N.C. 241, 242 (1815) (recognizing that a private citizen cannot sue to abate a public nuisance "unless he has received an extraordinary and particular damage," indicating that generally

_____

[9] The Owners appear to conflate fee simple ownership of the cottages with the right to use the property in certain ways. Although the right to use property is often considered part of the bundle of property rights associated with fee simple, those rights and fee simple ownership of property are not synonymous.

14

the government has the authority to act to abate such nuisances).[10]

By acting to abate what it believed was a nuisance, the Town simply kept the Owners from using their property in a way that was prohibited by law.  Because the law prohibited such use of property, the Owners had no right to use their property in that way.  The Town's actions to abate a nuisance were reasonable—if mistaken—uses of its police power that did nothing to deprive the Owners of any property right, even if the cottages were rendered valueless.  See Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 492 n.22 (1987) ("Courts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance.").

Of course, as the North Carolina Court of Appeals has since made clear, the Town does not have the authority to enforce the public trust doctrine; that power that lies exclusively with the state.  See Cherry, Inc., 723 S.E.2d at 158-62.  When the Town

---

[10] Even if § 16-31(6)(c) was not adopted in its current form when the cottages were built, the authority to abate nuisances exists without a specific ordinance.  See State v. Everhardt, 166 S.E. 738, 741-42 (N.C. 1932) ("A public nuisance exists wherever acts or conditions are subversive of public order, decency, or morals, or constitute an obstruction of public rights.  Such nuisances always arise out of unlawful acts.").

issued the nuisance declaration, however, North Carolina courts had not definitively addressed this issue.[11] We presume that the Town officials acted in good faith when issuing the nuisance declarations under the belief that they had this authority. See, e.g., Linan-Faye Const. Co., Inc. v. Hous. Auth. of City of Camden, 49 F.3d 915, 924 (3d Cir. 1995) (observing that a "court is required to presume good faith on the part of public officials"). For purposes of a due process claim, we consider the Town's actions based on the circumstances at the time the government acted, not with the benefit of later-developed law, because the purpose of the Due Process Clause is to ensure that the government treats its citizens fairly, a determination which is best made by focusing on what government officials knew and believed at the time they acted. See Carey v. Piphus, 435 U.S. 247, 262 (1978). Thus, for purposes of the Owners' constitutional claim, that the Town ultimately lacked the

---

[11] When the Town acted, the North Carolina Court of Appeals had decided Neuse River Found., Inc. v. Smithfield Foods, Inc., 574 S.E.2d 48 (N.C. Ct. App. 2002), and Fabrikant v. Currituck Cnty., 621 S.E.2d 19 (N.C. Ct. App. 2005), two decisions upon which the court relied in Cherry, Inc. but that had not conclusively resolved whether a political subdivision could enforce the public trust.

16

authority to declare the cottages to be nuisances based on the public trust doctrine is of no import.[12]

Because the Town never deprived the Owners of any property interest, their procedural due process right was not violated. The district court therefore properly granted summary judgment to the Town on this claim.

## C.

We next address the Owners' equal protection argument. The Owners argue that the Town violated the Equal Protection Clause when it declared their cottages nuisances because 14 other cottages that were in the public trust area under the Town's definition were not declared nuisances. We disagree.

The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This clause "is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  An equal protection claim involves two basic analytical steps.  First, a plaintiff must "demonstrate that he has been treated differently from others with whom he is similarly

---

[12] Whether this lack of authority could support any state-law claim is an issue that we do not consider.

situated and that the unequal treatment was the result of intentional or purposeful [government decision]." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).[13] Second, if a plaintiff has met this burden, then "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Morrison, 239 F.3d at 654. The level of scrutiny depends on the type of classification.

We assume without deciding that the Owners can satisfy the requirement that they are similarly situated to the owners of the other 14 cottages. Despite this assumption, the Owners' equal protection claim fails.

Because the Town's decision to classify some of these cottages as nuisances but not others does not involve a suspect or quasi-suspect classification,[14] we must uphold the Town's decision unless the Owners can prove that the decision fails rational basis review—that is, that no rational relationship

---

[13] Here, the Owners assert that they are a "class of one," a position which we accept for purposes of our analysis. See Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Although other circuits have discussed the impact of Engquist v. Oregon Department of Agriculture, 553 U.S. 591 (2008), on a "class of one" equal protection claim, such discussion is not necessary to resolving the claim before us.

[14] Such classifications trigger higher scrutiny. See Mitchell v. Comm'r of the Soc. Sec. Admin., 182 F.3d 272, 274 (4th Cir. 1999).

18

exists between the government action and a legitimate government purpose. See F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 314–15 (1993) (stating that the plaintiff bears the burden to show that a government action lacks a rational basis); see, e.g., Vill. of Belle Terre v. Boraas, 416 U.S. 1, 7–8 (1974) (reviewing a town ordinance regulating the number of unrelated people who could live together under rational basis review). Here, the Owners have failed to carry this burden because the Town has a rational basis for treating them differently than the owners of the other cottages.

Although all of the cottages—the Owners' six cottages and the other 14—may be in what the Town considers the public trust area, the Owners' cottages are substantially closer to the Atlantic Ocean than the other cottages. See J.A. 385, 391–92 (providing aerial pictures of the beach showing the difference in the location of the cottages). Ogburn, the Town manager, stated in his affidavit that the Owners' cottages "caused the most severe and continuous" obstruction of the beach. J.A. 376. This obstruction threatened public safety by hampering the ability of emergency vehicles to travel along the beach. J.A. 377. The Owners' contention that vehicles and individuals could still get around their cottages is of no import. See J.A. 1324–27 (Ogburn deposition admitting this fact). Whether vehicles and individuals could possibly pass by the cottages is not the

19

appropriate question; rather, the appropriate question is whether vehicles and individuals would have more difficulty in passing by the cottages. Based on the difference in the locations of the Owners' cottages and the 14 other cottages, the Town's determination that the Owners' cottages are more likely to interfere with travel along the beach is reasonable. The Town need not wait for these cottages to cause a disruption before taking action.

Furthermore, the Owners' contention that all cottages on the beach burden the public's access to use parts of the beach under the Town's theory of the public trust area is of no avail. Even if the Town could declare all cottages on the beach nuisances under its theory, the Town is not required to do so. As long as a rational reason exists for the Town's distinction between cottages, the distinction does not violate any cottage owner's constitutional right. Thus, that the Town did not declare some cottages further from the ocean to be nuisances does not invalidate the Town's decision to declare the Owners' cottages nuisances. Notwithstanding the Owners' contentions about all parts of the beach being valuable, different parts of the beach may present different issues with regard to public safety. Hence, the difference in the locations of the cottages on the beach is a legitimate basis for treating them differently.

Based on the need to ensure ease of emergency travel along the beach, the Town had a rational basis for its decision to declare the Owners' cottages, but not the others, nuisances under the Town's ordinance.[15] The Owners' equal protection right therefore was not violated by the Town's nuisance declaration, and the district court correctly granted summary judgment to the Town on this claim.

## III.

We now turn to the Owners' argument that the district court erred in dismissing their takings claim[16] as unripe based on the state-litigation requirement of Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City, 473 U.S. 172 (1985). Whether a takings claim is ripe under Williamson County is a question of law, which we review de novo. See Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006). We agree

---

[15] The Equal Protection Clause protects an individual from being treated differently, not simply wrongly, by the government. Thus, whether the Town was correct that it could declare any cottages nuisances under § 16-31(6)(c) because they were in the public trust is irrelevant here.

[16] The Owners allege three theories of a Taking by the Town: the Town's (1) denying Sansotta the opportunity to protect the cottages during the storm on November 12, 2009; (2) redefining private property as public land; and (3) ordering removal of the cottages as nuisances while denying permits to repair the damage to the cottages.

with the Owners that the Town has waived the state-litigation requirement by removing the case to federal court.

## A.

The Fifth Amendment's Takings Clause, applicable to the states through the Fourteenth Amendment, Chicago, B. & Q.R. Co. v. Chicago, 166 U.S. 226, 239 (1897), provides, "[N]or shall private property be taken for public use, without just compensation," U.S. Const. amend. V.  This clause "implicitly recognizes a governmental power" to take property for public use "while placing limits upon that power" by requiring that the government pay just compensation for any private property that it takes.  Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 130 S. Ct. 2592, 2614 (2010) (Kennedy, J., concurring in part and concurring in the judgment).

For a takings claim against a state or its political subdivisions to be ripe in federal court, the plaintiff must first have sought compensation "through the procedures the State has provided for doing so."  Williamson Cnty. Reg'l Planning Comm'n, 473 U.S. at 194.  Because the Takings Clause simply requires the payment of just compensation, not necessarily payment before or simultaneous with the taking, a plaintiff must first seek compensation from the state via the procedures that the state has established before suing the state in federal

22

court. Id. at 195; see also Holliday Amusement Co. of Charleston, Inc. v. South Carolina, 493 F.3d 404, 407 (4th Cir. 2007). Based on this requirement, a plaintiff cannot simultaneously bring a claim for compensation under state law and a claim under the Takings Clause in federal court; rather, the plaintiff must first pursue his state-law claim for compensation. See Holliday Amusement Co. of Charleston, Inc., 493 F.3d at 407.

This prohibition does not exist in state court. In contrast with a federal court, a state court may hear "simultaneously a plaintiff's request for compensation under state law and the claim that, in the alternative, the denial of compensation would violate the Fifth Amendment of the Federal Constitution." San Remo Hotel, L.P. v. City & Cnty. of San Francisco, Cal., 545 U.S. 323, 346 (2005). Thus, under San Remo Hotel, a plaintiff may bring a takings claim in state court without having already been denied compensation by the state, if he also brings his state-law claim for just compensation.

Here, the Owners did exactly what San Remo Hotel permits: they filed both their takings claims and their inverse condemnation claim, see N.C. Gen. Stat. § 40A-51, in state

23

court.[17] The Town then removed the case to federal court, as it was permitted to do under 28 U.S.C. § 1441 because the complaint raised a question of federal law. See 28 U.S.C. § 1331; Louisville & N.R. Co. v. Mottley, 211 U.S. 149, 152–53 (1908). The Town then invoked the Williamson County state-litigation requirement and asserted that the Owners' taking claim was unripe.

Although "[r]ipeness reflects constitutional considerations that implicate 'Article III limitations on judicial power,' as well as 'prudential reasons for refusing to exercise jurisdiction,'" Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1767 n.2 (2010) (quoting Reno v. Catholic Social Servs., Inc., 509 U.S. 43, 57, n.18 (1993)), the Williamson County state-litigation requirement involves only prudential considerations, Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 734 (1997); see also Stop the Beach Renourishment, Inc., 130 S. Ct. at 2610 (holding that Williamson County is not jurisdictional). Because Williamson County is a prudential rather than a jurisdictional rule, we may determine that in some instances, the rule should not apply and we still have the power to decide the case. See Washlefske v. Winston,

---

[17] North Carolina courts will hear these claims simultaneously. See, e.g., N.C. Dep't of Transp. v. Cromartie, 716 S.E.2d 361 (N.C. Ct. App. 2011).

24

234 F.3d 179, 182 (4th Cir. 2000) (observing that prudential ripeness focuses on whether "we should exercise federal jurisdiction").  This case is such an instance.  Allowing the Town to invoke the Williamson County state-litigation requirement after removing the case to federal court would fail to fulfill the rationale for this prudential rule and would create the possibility for judicially condoned manipulation of litigation.

The limitation imposed by the state-litigation requirement is grounded on the idea that "state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions related to zoning and land-use regulations."  San Remo Hotel, L.P., 545 U.S. at 347; see also Holliday Amusement Co. of Charleston, Inc., 493 F.3d at 409.  That state courts have this advantage over federal courts in experience with these issues, however, does not mean that federal courts are incapable of handling them.  Cf. San Remo Hotel, L.P., 545 U.S. at 350–51 (Rehnquist, C.J., concurring in the judgment) (observing that federal courts can hear First Amendment challenges to municipal land-use regulations despite state courts' greater familiarity with such ordinances and collecting cases).  Indeed, we are confident that federal judges, whenever they apply state law, can apply it correctly.  A defendant implicitly agrees with this

25

conclusion when he removes a case involving such a state or municipal law to federal court. Thus, the primary reason for the Williamson County state-litigation requirement no longer applies when the defendant removes a case.

Moreover, refusing to apply the state-litigation requirement in this instance ensures that a state or its political subdivision cannot manipulate litigation to deny a plaintiff a forum for his claim. The Supreme Court's decision in Lapides v. Board of Regents of the University System of Georgia, 535 U.S. 613 (2002), is an apt analogy here. In that case, a university professor brought an action pursuant to 42 U.S.C. § 1983, along with state-law claims, in state court after university officials put allegations of sexual harassment in his personnel file. Id. at 616. The defendants then removed the case to federal court and asserted Eleventh Amendment immunity. Id. The Court held that the state had waived its Eleventh Amendment immunity on these facts. Id. The Court reasoned:

> It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the "Judicial power of the United States" extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the "Judicial power of the United States" extends to the case at hand. And a Constitution that permitted States to follow their litigation interests by freely asserting both claims in the same case could generate seriously unfair results.

26

*Id.* at 619.  Based on this ability for a state potentially to manipulate litigation, the Court held that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter . . . in a federal forum."  *Id.* at 624. The Court was so intent on preventing any manipulation that it created a bright-line rule: any voluntary removal waives immunity.  *Id.* at 621 ("A benign motive, however, cannot make the critical difference for which Georgia hopes. Motives are difficult to evaluate, while jurisdictional rules should be clear.  To adopt the State's Eleventh Amendment position would permit States to achieve unfair tactical advantages, if not in this case, in others." (internal citation omitted)).

Here, if we substitute "the <u>Williamson County</u> state-litigation requirement" for "Eleventh Amendment immunity," the logic is precisely the same.  Like Eleventh Amendment immunity, a state or its political subdivision[18] is entitled to assert the state-litigation requirement when a plaintiff files suit in federal court.  But permitting a state or its political

---

[18] The Eleventh Amendment applies only to the states, <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 280 (1977), but the <u>Williamson County</u> state-litigation requirement applies both to states and their political subdivisions, <u>Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City</u>, 473 U.S. 172, 194 (1985).

subdivision to assert this requirement after the state or its political subdivision has removed the case to federal court would allow the state or its political subdivision to do in the context of the Takings Clause exactly what the Supreme Court has declared to be improper in the context of the Eleventh Amendment: invoke federal jurisdiction and then object to federal jurisdiction.[19]

Applying the reasoning of Lapides to the Takings Clause and Williamson County is both logically and legally sound. First, this reasoning does nothing to undermine the core rationale of Williamson County, as a plaintiff cannot bring a takings claim in federal court without having been denied just compensation by the state; such a claim can come into federal court before the state has denied compensation only when the state or its political subdivision chooses to remove the case to federal court. Second, it protects an innocent plaintiff who sought to comply with Williamson County and San Remo Hotel but whose efforts were thwarted by the state or political subdivision's decision to remove the case. Third, it prevents a state or its

_____

[19] The prudential nature of the Williamson County state-litigation requirement as compared to the constitutional basis of the Eleventh Amendment cannot logically or legally distinguish this case from Lapides. In both instances, the state could manipulate the litigation to deny a forum to the plaintiff.

political subdivision from manipulating litigation by removing to federal court claims properly filed in state court in accordance with <u>San Remo Hotel</u> and then claiming that the plaintiff cannot proceed on those claims, thereby denying a plaintiff <u>any</u> forum for having his claim heard. Fourth, and relatedly, it furthers our "strong preference for deciding cases on the merits" by preventing any procedural gamesmanship. <u>Heyman v. M.L. Mktg. Co.</u>, 116 F.3d 91, 94 (4th Cir. 1997).

B.

None of the Town's suggestions of what the Owners could have done convinces us that we should apply the state-litigation requirement here. First, the Town contends that the Owners should have sought remand of the takings claim. Yet the Owners could not have sought to have the district court remand this claim. Under 28 U.S.C. § 1441, a defendant may remove a "civil <u>action</u>," 28 U.S.C. § 1441(a) (emphasis added); <u>see also</u> <u>id.</u> § 1446 (providing the procedure for removal), and such a removal transfers the entire case to federal court, not simply individual claims in that action. After the Town properly removed this case and before the district court granted summary judgment to the Town on the federal claims, the Owners had no basis to seek to have that court remand any claims to the state court. <u>See</u> 28 U.S.C. § 1447 (providing the procedure for after a case is removed); <u>id.</u> § 1367(c) (providing the bases on which

29

a district court may decline to exercise supplemental jurisdiction).[20] When the case was removed, federal jurisdiction was proper, and the district court was obligated to exercise that jurisdiction unless it had a legal basis, such as abstention, see, e.g., Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976); Burford v. Sun Oil Co., 319 U.S. 315 (1943), to refrain from exercising that jurisdiction.

Second, the Town argues that the Owners should have reserved their takings claim with an England reservation. An England reservation permits a plaintiff who is forced to litigate state-law issues in state court to reserve explicitly his federal constitutional claims for a decision by a federal court. See generally England v. La. State Bd. of Med. Examiners, 375 U.S. 411 (1964); see also San Remo Hotel, L.P., 545 U.S. at 339-40. We do not believe that the Owners should

---

[20] The presence of other federal claims here easily distinguishes this case from cases in which a plaintiff has brought only a takings claim and has then sought remand based on Williamson County. See, e.g., Bauknight v. Monroe Cnty., Fla., 446 F.3d 1327 (11th Cir. 2006). In cases such as Bauknight, a plaintiff could fairly argue that the district court had no basis for jurisdiction because the case was not ripe. Here, by contrast, the district court clearly had subject-matter jurisdiction based on the substantive due process, procedural due process, and equal protection claims. Thus, Sansotta had no basis to ask the district court to remand the case after it had been removed.

have been required to reserve their federal takings claim. First, the record contains no indication that the Owners were dissatisfied with having their takings claim heard in state court; thus, they had no reason to reserve that claim for adjudication by a federal court, and they should not have had to presume that the Town, a political subdivision of North Carolina, would remove the case from its own courts to federal court. Second, assuming a plaintiff could make an England reservation, see Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal, Va., 135 F.3d 275, 283 (4th Cir. 1998) (citing Fields v. Sarasota Manatee Airport Auth., 953 F.2d 1299, 1303-07 (11th Cir. 1992)), requiring such a reservation here fails to fulfill the purposes of reserving a claim. When the Town removed the case, it brought the Owners' takings claim into federal court, thereby accomplishing the result of making an England reservation. Nevertheless, the Town then argued that the claim could not be decided at that time.

The Town's position undercuts its own argument. Had the Owners followed the Town's suggestion and reserved their takings claim, the result would have been the type of "piecemeal litigation" that the Supreme Court has rejected. San Remo Hotel, L.P., 545 U.S. at 346. On the other hand, because the Owners did not reserve their claim, it allowed the Town to manipulate the litigation and deny them a forum. Once the claim

31

is before a federal court, we see no reason to prevent the court from exercising its jurisdiction over the claim. As we have noted, the rationale for the state-litigation requirement disappears when a defendant removes the case to federal court. Furthermore, we are wary of the potential for manipulation and the associated unnecessary costs of litigating in multiple forums. Cf. Fed. R. Civ. P. 1 ("[The Federal Rules of Civil Procedure] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." (emphasis added)).

Third, the Town's suggestion that the Owners did not properly plead their takings and inverse condemnation claims in the alternative is unavailing. The Federal Rules of Civil Procedure remain committed to a notice-pleading standard that was adopted when the Rules were first promulgated in 1938. Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002); see also Fed. R. Civ. P. 8(a)(2) (providing that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). We see no reason why the Owners needed to use any special phrasing in their complaint, as this complaint gave the Town "fair notice" of the Owners' claims. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

32

Fourth, the Town maintains that the Owners could have asked the district court to abstain despite the case being unripe. But this position is untenable. "[R]ipeness is a question of subject matter jurisdiction." Reahard v. Lee Cnty., 978 F.2d 1212, 1213 (11th Cir. 1992). Because a district court can abstain only when it has subject matter jurisdiction, a case must be ripe before a district court may abstain. Cf. Colorado River Water Conservation District, 424 U.S. at 817 (discussing whether abstention was appropriate only after noting that subject matter jurisdiction existed). Accordingly, the Town cannot contend that the Owners' taking claim is unripe and that the Owners should have asked the district court to abstain, as such legal positions are logically incompatible.

C.

Although the remand of claims to state court is generally not an appealable final order under 28 U.S.C. §§ 1447(c) and (d), see Gravitt v. Sw. Bell Tel. Co., 430 U.S. 723, 723–24 (1977) (per curiam) (citing Thermtron Products, Inc. v. Hermansdorfer, 423 U.S. 336 (1976)), we may review such a remand when a district court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) because such a decision is not a remand for lack of subject matter jurisdiction, see Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639–40 (2009) ("Upon dismissal of the federal claim, the District Court

33

retained its statutory supplemental jurisdiction over the state-law claims.  Its decision declining to exercise that statutory authority was not based on a jurisdictional defect but on its discretionary choice not to hear the claims despite its subject-matter jurisdiction over them.").

Given our holding that the Town waived the state-litigation requirement by removing the case to federal court, we now address the district court's decision to remand the state-law claims to state court.  First, the district court focused on the fact that no federal law claims remained, see Sansotta I, 863 F. Supp. 2d at 514–15, but as we have made clear here, the takings claim was ripe and does remain.  Second, the district court emphasized the important issues of state law raised by the state-law claims.  See id. at 515.  However, based on the decision of the North Carolina Court of Appeals in Cherry, Inc., further clarification from a state court may not be needed for the district court to decide these claims.[21]  See Cherry, Inc.,

---

[21] In Town of Nags Head v. Toloczko, 863 F. Supp. 2d 516, 528 n.6 (E.D.N.C. 2012), the district court observed that the North Carolina Supreme Court had not yet decided whether to review the decision from the state court of appeals in Cherry, Inc.  The state supreme court has now denied discretionary review of that decision.  See Town of Nags Head v. Cherry, Inc., 733 S.E.2d 85 (N.C. 2012).  We see no reason not to defer to the decision of the state court of appeals here.  See United States v. King, 673 F.3d 274, 279 (4th Cir. 2012) ("If the highest court of the state has not decided an issue of state law, we generally defer to the state's intermediate appellate courts on
(Continued)

34

723 S.E.2d at 158–62.  Third, the district court noted state courts' greater expertise with issues of state land-use law. See Sansotta I, 863 F. Supp. 2d at 515.  Nevertheless, as we have expressed already, we have confidence in the district court's ability to apply this state law, and that by removing the case, the Town implicitly shares our confidence in the district court.  In light of our holding today, the district court must reconsider whether it should exercise supplemental jurisdiction over the state-law claims.[22]

*   *   *

Based on our conclusion that a state and its political subdivisions waive the state-litigation requirement by removing a case to federal court, the district court erred in dismissing the Owners' takings claim as unripe.  Thus, we remand this claim to the district court for further proceedings.  Whether the district court should decide the claim on the merits, abstain from deciding the claim, or take another approach is a question

---

the issue.").  Thus, the impact of the decision of the North Carolina Court of Appeals in Cherry, Inc. should be considered in determining whether supplemental jurisdiction should be exercised.

[22] Although the Owners have not explicitly appealed the district court's decision to remand these claims, this issue is closely related to the ripeness of the takings claim, and we have elected to decide it now.

that we leave for the district court to address on remand.[23]  For purposes of this appeal, we simply hold that the district court erred when it dismissed the Owners' takings claim for lack of ripeness after the Town removed the case to federal court.

IV.

We therefore affirm the district court's grant of summary judgment to the Town on the Owners' procedural due process and equal protection claims, reverse the district court's dismissal of the Owners' takings claim for lack of ripeness, and remand for further proceedings.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>

---

[23]  In holding that the district court erred in dismissing the Owners' takings claim as unripe, we make no comment on the merits of their claim.