**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 17a0007n.06

Case No. 15-2289

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jan 05, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LILLY INVESTMENTS; DENTISTS ON MAIN, P.C.; LOUIS E. LEONOR, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| CITY OF ROCHESTER; ROCHESTER PLANNING COMMISSION, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: BATCHELDER, MOORE and COOK, Circuit Judges.

COOK, Circuit Judge. This case concerns Louis Leonor's efforts to open a dental clinic in Rochester, Michigan. The clinic stands nearly complete, but in May 2013 Rochester issued a stop-work order preventing Leonor from finishing and operating the clinic, prompted by an expert's finding that the clinic does not comply with the conditions of a city permit. That same expert found compliance a few months later after Leonor made corrective changes. Nonetheless, Rochester refused to lift the stop-work order or take an up-down vote on the project unless Leonor waived any legal claims and paid a $40,000 fee. Unwilling to comply with those conditions, Leonor filed a complaint asserting a regulatory taking, which the district court dismissed on ripeness grounds, citing the lack of a "final decision." We now REVERSE.

**I.**

Louis Leonor, a dentist turned real-estate developer, purchased property in Rochester to build a modern dental facility. In September 2011, Leonor sought approval from the Rochester Planning Commission ("Commission") to begin construction. The initial site-plan-approval application called for demolishing the existing structure, a house built in 1878.

At its September meeting, the Commission took issue with demolishing the house in light of its perceived historical significance. Leonor's architect, Peter Stuhlreyer, responded that renovating the house would cost twenty-five percent more than tearing it down and starting anew. The parties also discussed parking. City regulations require that commercial developments either provide parking or pay into a parking fund. According to Rochester, Leonor would owe almost a half million dollars if he could not provide onsite parking. Stuhlreyer told the Commission that the planned renovation was financially infeasible without a parking-fee waiver.

After several months of back and forth, the parties reached an agreement in February 2012. In exchange for a full parking-fee waiver, Leonor agreed to demonstrate "reasonable compliance" with the Secretary of the Interior's Standards for property rehabilitation and save a purported Chinese Elm tree on the property. The Secretary of the Interior's Standards for the Treatment of Historic Properties ("SOI standards") set forth different building guidelines depending on the developer's goal: preservation, rehabilitation, restoration, or reconstruction. Preservation requires the greatest retention of historic features, reconstruction the least. The parties settled on "rehabilitation"—the middle ground that seeks to minimize the alteration of historic features while permitting the removal of materials when necessary. To address

interpretive disagreements over "reasonable compliance," they stipulated that "an outside expert will be selected by the City Administration and paid for by [Leonor]."

The project faced problems soon after construction began in May 2012. Rochester condemned the property in October 2012 after excavation work undermined an adjacent property's wall and Leonor's construction crew removed the purported Chinese Elm tree in violation of the approved site plan. Over the next few months, it also became apparent that the parties disagreed over whether construction to date "reasonably complied" with the SOI standards for rehabilitation. To help resolve the brewing dispute, the Commission hired Ed Francis, an architect and "preservation expert," to evaluate the building's compliance with the SOI standards. Francis presented his report to the Commission in February 2013, concluding that the project "meets only in part" the SOI standards for rehabilitation. At its April 2013 meeting, the Commission made a finding of non-compliance "as demonstrated by [Francis]'s report."

The parties worked to resolve their disagreements in the succeeding months. Leonor submitted an amended landscape plan in March, and the Commission told Leonor he could donate to a "tree fund" to remedy the tree removal. The Commission toured the clinic in April and invited Leonor to address the issues highlighted in Francis's report. To that end, Stuhlreyer met with the City Manager and two historic architects to discuss how Leonor could cure those deficiencies. Their meeting produced an April 25 letter from one of the architects recommending 16 remedial measures. Stuhlreyer made many of those changes, believing that the City Manager authorized him to perform the modifications before receiving Commission approval, a fact that Rochester disputes.

The Commission met on May 6, 2013 to discuss how Leonor could regain approval. Stuhlreyer presented the remedial changes outlined in the April 25 letter to the Commission and explained that many were already complete. The Commission expressed its willingness to approve an amended site plan reflecting the current state of the property on the condition that Leonor both make a $5,040 payment to offset the tree removal, and work with Rochester to develop a formula to "justify a payment [into] the parking fund less than $480,000."

Thereafter, Rochester imposed a stop-work order on May 28 after negotiations between the Commission and Leonor broke down. The Commission voted in June to continue the stop-work order until it approved an amended site plan. In July, Leonor submitted to the City Planner a site plan reflecting many of the remedial changes outlined in the April 25 letter. The City Planner reviewed the plan and recommended that the Commission accept it if the Commission was satisfied with those modifications. At its next meeting in August, the Commission took no action on the City Planner's recommendation. Instead, it instructed the City Attorney to negotiate the removal of the stop-work order, contingent on Leonor waiving "certain rights and claims against the City." Leonor maintains that he met with city officials in September but refused to agree to any hold harmless condition.

Soon after, the Commission hired Ed Francis to reevaluate the property. This time around, Francis found Leonor's development "reasonably compliant" based on the changes Leonor made following Francis's first report. The Commission, however, did not disclose that second report or its favorable findings until Leonor later obtained it in discovery.

Unaware that Francis had now found the clinic "reasonably compliant," Stuhlreyer met with the Commission on October 23 to discuss the project. During the meeting, it was suggested that a $40,000 payment into a historic preservation fund would lift the stop-work order. And

around this same time, the City Attorney advised Leonor that the stop-work order would remain in place until Leonor submitted yet another amended site plan, though the Commission had not taken up the earlier-submitted plan.

Negotiations stalled over the next three months. Stuhlreyer gave a presentation at the November Commission meeting that covered much of the information that the Commission had previously requested, yet consideration of lifting the stop-work order was tabled until December. In the meantime, the Commission instructed Leonor to submit a complete package consisting of the project as originally approved and a revised site plan. Leonor submitted this information the day of the next Commission meeting in December. The Commission took issue with the submission's timeliness and the fact that it "had no tables, summaries, or rationales" for what materials were included, but voted to receive it anyway. The Commission took no further action on the project in December.

At the next scheduled meeting in January 2014, the Commission once again declined to vote on the revised site plan. Instead, it created a subcommittee tasked with "meet[ing] with the applicant . . . to discuss what the expectations are of the Planning Commission, what remains to be done and to secure a written stipulation between the parties for settlement purposes in order to address all outstanding issues to settle the matter."

At that point, Leonor had had enough. He filed a complaint in Michigan state court on January 29, 2014, alleging, *inter alia*, a regulatory-takings claim. Rochester removed the case to federal court, filed an answer and counterclaims, and later moved to dismiss on ripeness grounds under Federal Rule of Civil Procedure 12(b)(1). The district court referred the motion to a magistrate judge, who recommended that Leonor's claim be found ripe for review. The district court, however, disagreed and dismissed Leonor's complaint. This appeal followed.

**II.**

"We normally review de novo the district court's decision to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Lovely v. United States*, 570 F.3d 778, 781 (6th Cir. 2009) (quoting *Howard v. Whitbeck*, 382 F.3d 633, 636 (6th Cir. 2004)). But where the defendant challenges the factual predicates of jurisdiction, as Rochester does here, "we review the district court's factual findings for clear error" and its application of law to fact de novo. *Id.* at 781–82 (quoting *Howard*, 382 F.3d at 636).

We accept the facts as found by the district court because none are clearly erroneous. Whether those facts establish a ripe claim is the issue for this court to decide. *See Howard*, 383 F.3d at 636–37.

**III.**

A regulatory-takings plaintiff must satisfy two independent criteria to establish that his claim is ripe for review: finality and exhaustion. Finality requires the plaintiff to demonstrate that the decision-making body has "reached a final decision regarding the application of the regulation to the property at issue." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). As to exhaustion, the plaintiff must "seek compensation through the procedures the State has provided" before bringing suit in federal court. *Id.* at 194. Both hurdles are prudential, not jurisdictional, and this court applies neither mechanistically. *See, e.g.*, *Horne v. Dep't of Agric.*, 133 S. Ct. 2053, 2062 (2013); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1012–13 (1992).

The district court dismissed Leonor's complaint for failing to satisfy the finality prong and therefore did not address the exhaustion requirement. Leonor argues that his complaint satisfies both requirements. We agree.

## A. Finality

The finality requirement ensures that an alleged taking has sufficiently crystalized to enable review of the merits. The substantive inquiry in a regulatory-takings claim—whether a regulation "goes too far"—simply "cannot be resolved in definitive terms until the court knows 'the extent of permitted development' on the land in question." *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2011) (quoting *MacDonald, Sommer & Frates v. Yolo Cty.*, 477 U.S. 340, 351 (1986)); *see also Williamson Cty.*, 473 U.S. at 190.

At the same time, however, rigid application of the finality requirement would allow states to avoid the strictures of the Takings Clause by simply refusing to act or by imposing unfair conditions on disfavored developments. Courts therefore recognize a number of exceptions to the finality requirement, two of which are implicated here. First, a property owner is excused from obtaining a final decision when the parties have reached an "impasse" and further proceedings "would not be productive." *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1362–63 (6th Cir. 1992). The "impasse" exception reflects this court's judgment that in some cases, it is pointless "to put barriers to litigation in front of litigants when it is obvious that the process down the administrative road would be a waste of time and money." *Id.* at 1362. Second, a state may not impose "repetitive or unfair land-use procedures in order to avoid a final decision." *Palazzolo*, 533 U.S. at 621; *see also MacDonald*, 477 U.S. at 350 n.7. Although analytically distinct, the "impasse" and "unfair procedures" exceptions dovetail as applied to Leonor's claim and can be grouped under the umbrella of "futility."

The magistrate judge applied the futility exception and recommended that Leonor's claim be allowed to proceed. The district court rejected the magistrate judge's ripeness finding and concluded that Leonor "ha[d] not been met by the consistent and persistent pattern of resistance"

that warrants application of the futility exception. As explained below, we agree with the magistrate judge that the facts of this case warrant application of the futility exception.

The futility exception resists rote application. It is true, as the district court recognized, that many cases excusing compliance with the finality requirement involve prolonged delays calculated to defeat the landowner in a "war of attrition." *See, e.g.*, *Sherman v. Town of Chester*, 752 F.3d 554, 563 (2d Cir. 2014); *id.* at 558–59, 563 (finding futility where a town board required a permit applicant to submit four development plans over five years, only to change its zoning regulations after each submission); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1502–06 (9th Cir. 1990) (finding futility on similar facts). The impasse here is different. Rochester appeared willing to consider an amended site plan, but only on the condition that Leonor both waive his right to bring claims against Rochester and pay $40,000 as a penalty for his supposed failure to "reasonably comply" with the SOI standards for rehabilitation. The Commission's demands presented Leonor with a Morton's Fork: the choice between "voluntarily" waiving potential claims and forgoing a necessary ingredient to ripen those claims—a "final decision." Leonor maintains that the parties are therefore at an "impasse," and that their core dispute—whether the stop-work order amounts to a regulatory taking—is sufficiently defined to permit judicial review.

The record supports Leonor's position. Rochester issued its stop-work order in May 2013 after finding that Leonor's clinic did not "reasonably comply" with the SOI standards for rehabilitation "as demonstrated by the [first] report from [Ed Francis]." Leonor implemented a number of changes recommended by a historical expert and on July 9 submitted a site plan reflecting those changes. Francis reevaluated the property in September and issued a second report finding the building reasonably compliant. Yet even though the Commission's primary

justification for imposing the stop-work order—then and now—is Leonor's purported failure to demonstrate "reasonable compliance," and even though it expressly relied on Francis's earlier report in finding non-compliance, the Commission never disclosed that the second report justified lifting the ban on the project and also never took an up-down vote on the project.

Instead, the Commission leveraged the stop-work order to obtain a waiver of all claims and $40,000. At its August 2013 meeting, rather than vote on the changes outlined in Leonor's July 9 site plan, the Commission instructed the City Attorney to obtain from Leonor, "in return for removing the stop work order," a "waiv[er] [of] certain rights and claims against the City." And then in January 2014, the Commission tabled consideration of another amended site plan— this one submitted in December—until a subcommittee could "secure a written stipulation [from Leonor] . . . for settlement purposes."

Both the magistrate judge and district court questioned the propriety of the waiver demand, and Leonor suggests it may be unconstitutional. *See R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005) (explaining that "a state actor cannot constitutionally condition the receipt of a benefit . . . on an agreement to refrain from exercising one's constitutional rights" (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1077 (6th Cir. 1994))). Regardless of the constitutionality of the waiver demand, tying the go-ahead to Leonor's waiver of potential claims supports applying the futility exception.

As for Rochester's request for $40,000, Rochester characterizes it as a way for Leonor to atone for his supposed inability to deliver what was promised—"reasonable compliance" with the SOI standards for rehabilitation. Yet the request was made *after* Francis's second report found "reasonable compliance" with those standards. Accordingly, Leonor argues that the Commission was actually holding Leonor to a higher standard than the parties agreed to, a

position that finds support in the record. Between approving the clinic and Leonor's filing suit, individual Commission members appeared to shift positions on what Leonor must show, ping-ponging from rehabilitation to "preservation and restoration." Indeed, at the final Commission meeting before Leonor brought suit, multiple Commission members expressed dismay that Leonor had not "renovated" or "restor[ed]" the building. This moving target criterion underpinning a five-figure payment demand exposed Leonor to the sort of unfair procedures that the futility exception is intended to address. *See Sherman*, 752 F.3d at 563; *Del Monte Dunes*, 920 F.2d at 1506.

Rochester raises a number of arguments to defeat a futility finding. First, Rochester portrays the waiver-demand and $40,000 request as mere starting points for negotiations, not "ultimate condition[s]." But the record suggests otherwise. The August 2013 meeting minutes make clear that "*there will be no more action until*" Leonor "waive[s] certain rights and claims against the City." Although the January minutes lack the same imperative, the Commission's August directive and its failure to vote on the project over the next six months contradict the City's "negotiable" characterization.

Second, Rochester argues that the Commission was and is prepared to take an up-down vote on the project even if Leonor refuses to meet either condition, and attributes the hold up to Leonor's failure to submit a full amended site plan. Here again, the record tells a different story. By the time Leonor filed suit, he had recently submitted *two site plans*, in July and December 2013. Yet the Commission voted on neither, choosing instead to demand a legal waiver—twice—and a $40,000 payment. The Commission argues that these amended site plans were somehow non-compliant, but the meeting minutes from December show that the Commission agreed to "receive the documentation" without requesting additional materials.

Third, Rochester takes issue with Leonor's reliance on the second Francis report, arguing that the Commission, not Francis, retained final decision-making authority on the issue of reasonable compliance. The district court agreed with the Commission. And given that compliance was the Commission's call, the district court reasoned, Leonor's takings claim was not ripe for decision.

We have no quarrel with the district court's factual finding that it remained the Commission's prerogative to determine "reasonable compliance." But the district court's legal conclusion ignores the full import of Francis's second report. The Commission chose to condition its parking-fee waiver on Leonor's demonstration of "reasonable compliance" with a highly-technical preservation standard that the Commission recognized as having a "broad range [o]f interpretations." And the Commission chose to designate Francis, paid by Leonor, as the umpire for grey-area questions. We agree with the magistrate judge that "the approving body cannot implement a vague standard, refuse to define it, fail to vote on an applicant's compliance with the standard, and then fault the applicant for not receiving a final decision on its compliance." The second favorable Francis report undermines the Commission's stated basis for continuing the stop-work order, and the Commission's decision to bury the report during negotiations subjected Leonor to "unfair procedures." *See Del Monte Dunes*, 920 F.2d at 1503–06 (finding futility based, in large part, on a planning commission's decision to act against the recommendation of its own planning staff).

Finally, Rochester continues to maintain that the clinic as built does not "reasonably comply" with the SOI standards for rehabilitation. But this only reinforces our conclusion, supported by the record as a whole, that the Commission prejudged the clinic to be non-compliant to obtain favorable concessions.

We accordingly hold that Leonor meets the finality prong. We turn next to the exhaustion requirement.

## B. Exhaustion of State Remedies

*Williamson County*'s second prudential hurdle requires a takings plaintiff to exhaust state remedies before seeking redress in federal court. *Williamson Cty.*, 473 U.S. at 194. It reflects the Court's recognition that a "property owner has not suffered a violation of the Just Compensation Clause until the owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State." *Id.* at 195.

Were the exhaustion requirement applied strictly, Leonor's claim would fail because he never received a judgment from the state court. Although Leonor sought compensation in Michigan state court, Rochester short-circuited the state-litigation process by removing to federal court. Leonor asks this court to recognize an exception to the exhaustion requirement where, as here, the plaintiff sues in state court and the defendant removes.

The Sixth Circuit has not addressed whether, and under what circumstances, a court may excuse compliance with the exhaustion requirement. Recently, both the Second and Fourth Circuits held that a defendant waives the requirement by removing to federal court. *See Sansotta v. Town of Nags Head*, 724 F.3d 533, 545–47 (4th Cir. 2013); *Sherman*, 752 F.3d at 564. Those courts recognized that "refusing to apply the state-litigation requirement in this instance ensures that a state or its political subdivision cannot manipulate litigation to deny a plaintiff a forum for his claim." *Sherman*, 752 F.3d at 564 (quoting *Sansotta*, 724 F.3d at 545). This court recently cited *Sansotta* with approval. *A Forever Recovery, Inc. v. Twp. of Pennfield*, 606 F. App'x 279, 282 (6th Cir. 2015) (citing *Sansotta* as an example of how "[i]n some unripe federal-takings-claim cases . . . the exercise of federal jurisdiction [is] not objectively unreasonable").

- 12 -

We find the Second and Fourth Circuit's reasoning persuasive. The primary justification for the state-litigation requirement is that "state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions related to zoning and land-use regulations." *San Remo Hotel, L.P. v. City & Cty. of San Francisco, Cal.*, 545 U.S. 323, 347 (2005). But as the Fourth Circuit recognized, "[t]hat state courts have this advantage . . . does not mean that federal courts are incapable of handling them." *Sansotta*, 724 F.3d at 545 (citing *San Remo Hotel, L.P.*, 545 U.S. at 350–51 (Rehnquist, C.J., concurring in the judgment)). When a state or locality removes to federal court, it "implicitly agrees" with the competence of federal courts to decide the plaintiff's claim. *Id.* The Supreme Court relied on similar reasoning in holding that, at least in some cases, a state waives its sovereign immunity by removing to federal court. *See Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 619, 624 (2002) ("It would seem anomalous or inconsistent for a State both (1) to invoke federal jurisdiction, thereby contending that the 'Judicial power of the United States' extends to the case at hand, and (2) to claim Eleventh Amendment immunity, thereby denying that the 'Judicial power of the United States' extends to the case at hand.").

Rochester argues that recognizing an exception here would be a "radical departure" from long-established precedent. But the majority of cases Rochester cites for support involved plaintiffs who filed their complaint directly in federal court—the exact scenario *Williamson County* was looking to prevent—and all of them were decided before *Sherman* and *Sansotta*. *See Marek v. Rhode Island*, 702 F.3d 650, 652 (1st Cir. 2012) (plaintiff filed in federal court); *Peters v. Village of Clifton*, 498 F.3d 727, 728–29 (7th Cir. 2007) (same); *Busse v. Lee Cty.*, 317 F. App'x 968, 970 (11th Cir. 2009) (per curiam) (same). Moreover, it appears that only the Eighth Circuit has affirmatively declined to waive the exhaustion requirement in removal cases,

*see Snaza v. City of St. Paul, Minn*., 548 F.3d 1178, 1182 (8th Cir. 2008), and it is the only circuit that considers *Williamson County* jurisdictional, a conclusion inconsistent with Supreme Court precedent. *See, e.g.*, *Horne v. Dep't of Agric.*, 133 S. Ct. 2053, 2062 (2013) (describing *Williamson County* ripeness as "prudential"); *Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 729 (2010) (same).

We accordingly join the Second and Fourth Circuits in holding that a defendant waives the exhaustion requirement by removing to federal court.

## IV. Conclusion

For these reasons, we REVERSE the district court's dismissal of Leonor's takings claim for lack of ripeness and remand for further proceedings.